**DOLEZAL v CLEVELAND, CANTON & COLUMBUS MOTOR FREIGHT CO**

Cuyahoga Municipal Court

No 733377.

## OPINION

By DRUCKER, J.

The mere recital of the facts of this case leaves no doubt as to the liability of the defendant. The only controversial element relates to the measure of damages and raises an inquiry as to whether the extent of the carrier's liability is to be determined solely by a rule of a property law,—that is, that a bailee for hire is liable·for the value of misdelivered goods as of the time of conversion, or whether that liability is a broader one under the contract herein involved.

The failure of the buyer in this case to make the contracted payments for the first four shipments may have constituted a material breach of contract and so might have excused the plaintiff from any further performance on his side. Uniform Sales Act §45 (§8425 GC).

It is not necessary however to pass upon that point. Nor is it necessary to determine whether the plaintiff was privileged to change the credit term of the contract to a cash term in respect to shipments subsequent to May 15 because of the buyer's breach of contract as to payments for the first four. It is sufficient to state that the contract was one for future goods to be manufactured by the seller and that the Uniform Sales Act is in force both in Ohio and in Pennsylvania (Ohio §§8381-8456 GC; Pa. St. 1920 §§19649-19726).

We take note initially of cases which seem to sustain the proposition that, where goods are shipped by a seller for ultimate delivery to a buyer under such conditions that the seller retains the "property" in or the right of possession of the goods for the purpose of forcing from the buyer some performance other than that which the buyer is obligated to render under the sales contract, the buyer becomes entitled to the possession of those very goods upon a tender of his own performance according to the contract terms. See Rudin v King-Richardson Co., 311 Ill. 513, 143 NE 198.

If it be assumed that the seller was entitled to no payment, or at most to payment only of the price of this particular

shipment, concurrently with the delivery of the goods comprised in the shipment, the question still remains: Would the buyer have established his right to the possession of the very goods carried by the defendant if he had tendered payment of the price of this shipment? Keeping constantly in mind the fact that the contract was one for future goods, the answer must inevitably be No.

At the inception of the contract the buyer acquired no title or right of possession to any goods, for no goods were then in existence as to which a contract had been made. When the plaintiff seller subsequently manufactured goods which he intended to be devoted to performance of the contract, no title or right of possession to such goods passed to the buyer coincidently with completion of the manufacturing process.

"Some subsequent act in regard to the goods seems generally supposed to be necessary as a manifestation of mutual assent **after the goods have become specified** to transfer the property in them. The intention alone seems not to have been thought enough, and certainly unless clearly so agreed, the completion or identification of the goods is not a sufficient manifestation of intention by outward act." Willston on Sales §274.

Our Sales Act enacts this proposition as a rule of presumption:

"Sec 8399 GC * * *

Rule 4(1) When there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in goods thereupon passes to the buyer."

Accordingly, some act of appropriation subsequent to manufacture of goods is necessary in order to transfer a property interest in such goods to the buyer. Was there an unconditional appropriation of the steel sash to the performance of the contract in this case? We read "unconditional" in the sense of being without conditions other than these specified in the contract.

Plaintiff shipped the sash under a straight bill of lading consigned to the buyer, "C.O. D. $659.00." Did this amount to an unconditional appropriation of the consigned sash

to the contract? By §8399, **Rule 4(2), GC,** it is provided that where the seller, **in pursuance of a contract to sell,** delivers the goods to a carrier for the purpose of transmission to the buyer, he is presumed to have unconditionally appropriated the goods to the contract, and "this presumption is applicable, although **by the terms of the contract,** the buyer is to pay the price before receiving delivery of the goods, and the goods are marked with the words 'collect on delivery' or their equivalents." That this is a rule of presumption which may be rebutted by evidence of an intention to the contrary we pass over and proceed to consider whether the section could have any application to the situation before us. By hypothesis, the seller was entitled to not more than the price of the shipment upon delivery of the same; hence the seller was retaining possession through the agency of the carrier for the purpose of exacting from the buyer a greater sum than the seller was entitled to receive. It follows, then, that the seller did not deliver the goods to the carrier in pursuance of a contract to sell, but rather under restrictions which were wholly variant from the contract. If a seller is entitled to receive not more than $312 under the terms of a sales contract, then the delivery of goods to a carrier under an instruction not to relinquish possession until the buyer pays $659 cannot be termed an unconditional appropriation of such goods "to the contract." Hence, the act of the plaintiff passed no property interest, formal or beneficial, to the buyer. Accordingly the buyer would have shown no right to the possession of any particular goods had he made a tender of the $312 plus, from which it results that defendant herein cannot limit plaintiff's recovery on the ground that the buyer was entitled to dispossess the seller of the very goods which are the subject matter of this action by tendering $312 plus.

We do not pass upon the propriety of the plaintiff's conduct in relation to the buyer. What he did may or may not have been a breach of his sales contract. What we are concerned with in this branch of the case is a property question: Did the buyer have any beneficial interest in the goods shipped, absolute possession of which he was entitled to obtain upon payment of the sum of $312? Our answer can probably be stated most simply in this manner: Plaintiff seller was under a duty to deliver sash of a particular description to the buyer, but the contract related to no definitely ascertained

and identified sash. Plaintiff had on hand a quantity of sash which answered the contract description, but he was under no duty to deliver that sash to the buyer. Plaintiff could tender the latter sash to the buyer subject to any conditions relating to price, payment of old accounts, etc., that he might choose to impose without thereby conferring a property interest in such sash on the buyer.

Our conclusion leads us to reject unqualifiedly both the reasoning and the result of such cases as Rudin v King-Richardson Co., supra, and Banik v C. M. & St. P. Ry. Co., 147 Minn. 175, 179 NW 899. It seems to us that in these cases a contract question has been confused with one of propriety. This court can find no basis in reason for holding that a breach of contract by a seller necessarily results in conferring a property interest in goods upon the buyer. Equally futile is it to search the Uniform Sales Act for a declaration that a property interest in goods passes to a buyer where the seller appropriates the goods, not to the contract, but to a proposition wholly variant from the contract between the parties. In such a situation the seller is undoubtedly making a new proposal to the buyer, and no matter what the ethical implications of the pressure which the seller is exerting, the fact remains that the tender of goods under the variant proposal confers upon the buyer no right or power to secure their possession merely by tendering the price that would be due for that kind of goods under the terms of the original contract. The buyer can acquire rights in **those very goods** only by accepting and conforming to the terms of the seller's new proposal. What the situation would be had the contract been one for definitely ascertained goods is a matter upon which the issues of this case do not require us to pass.

The confusion that has prevailed in some quarters in regard to this phase seems to us to be due to the emphasis which has been placed upon the general rule that delivery of goods to a carrier for the purpose of transmission to a buyer amounts to a delivery to the buyer and so operates presumptively to carry the title, or what is known as the beneficial interest, to the buyer, without taking into consideration the underlying requisites of that rule. Thus, the shipment of goods which vary somewhat from the contract quality does not result in the passage of title to the buyer immediately upon delivery of the goods to the carrier consigned to the buyer, subject

to the title being thrown back upon the seller upon the buyer's inspection and discovery that the goods are not of the contract quality; in the absence of some conduct of the buyer amounting to an acceptance of the goods after shipment, the property in the goods never passes to the buyer, for, under §8399 (Rule 4) GC, the attempted appropriation of such goods to the contract must be with the assent of the buyer and it would be absurd to assume that the buyer has given his prior assent to the appropriation of goods which did not conform to the contract description. Similarly, if the contract calls for shipment by a particular route and the seller ships goods of a proper kind by another route, no property interest in such goods accrues to the buyer upon shipment. Woodbine Clothing Co. v Goldnamer, 134 Ky. 538, 121 SW 444; St. John Bros. Co. v Falkson, 237 Mass. 399; 130 NE 51; Ohio Confection Co. v Eimon Merc. Co., 154 Minn. 420, 191 NW 910. "In order for the property to pass * * * the seller must have acted in conformity with authority given him by the buyer * * * the property will not pass if the goods are too many, or too few, or if they are sent at a materially different time, or by a different route or method of shipment, or under a different bill of lading, or are misdirected." Williston on Sales, §278.

Failure of the Commissioner who wrote the opinion for the Supreme Court of Minnesota in the Banik case, supra, to take account of the opposite provisions of the Uniform Sales Act is strikingly illustrated by the opinion of the same Commissioner in Ohio Confection Co. v Eimon Merc, Co., 154 Minn. 420, 191 NW 910. In both cases the contract was for unascertained or future goods. In the Banik case, the Commissioner held that the property in goods shipped by the seller passed to the buyer who became the "true owner," although everything about the shipment other than the quality of the goods was contrary to the contract terms; in the Ohio Confection case he held that the property in the goods did not pass to the buyer because the shipment was not made in accordance with the terms of the contract as to routing and time. The property question was at issue in each case; the former action was one for conversion; the latter was an action by the seller for the price of goods shipped. We think it clear that, where the contract is for unascertained goods and there is a tender of goods upon conditions inconsistent with the contract terms, there is no

election in the buyer to take a property interest in such goods merely by performing what he is obligated to do under the contract. His only election is to accede to the seller's proposal or to refuse to have anything to do with the goods. His remedy is an action for breach of contract, which we regard as still available to him even though he submits to pressure and takes the goods on the seller's new terms. But he can have no property interest in such goods until he satisfies such new terms.

Accordingly it would aid the defendant in no way if it were held that the plaintiff were guilty of breach of contract, a matter which we have made it clear that we do not decide. Any attempt by the defendant to assert that plaintiff's interest in the goods was limited to the price which it was entitled to collect for the shipment in question is unsustained by the Uniform Sales Act. Plaintiff's interest in the goods was absolute and was subject to being divested only upon such terms and conditions as plaintiff chose to impose.

We turn then to a consideration of the manner in which the damages are to be determined.

When defendant accepted the shipment in question it assumed a two-fold relation to plaintiff: first, it became a bailee for hire; second, it contracted to act as plaintiff's collection agent. In both capacities defendant violated the duties which it owed to plaintiff. As a mere bailee, it was guilty of a disregard of instructions which eventuated in a misdelivery of the bailed chattels; this was a conversion and the good faith of the carrier or of its functioning representative is no defense. As an agent for collection, defendant failed to perform its contractual promise; a breach of contract from which damage resulted to the plaintiff has been amply proved. Nothing turns on the rule that a common carrier owes no common law duty to act as a collection agent for a shipper. Defendant here, of its own volition, agreed so to act by its mere acceptance of this shipment.

It may be added parenthetically that the court is of the opinion that fraud cannot be predicated of the fact that plaintiff made the C.O.D. charges greater than may have been the value of the goods. In contracting with the carrier for the collection of $659.00 for him before delivery of the goods, we find no representation by the plaintiff as to their value.

Plaintiff has stated and proved a set of facts which constitute a cause of action

both in conversion and for breach of contract. While admitting liability, defendant maintains that this court should apply the tort measure of damages and hold it responsible only for the value or price of the goods at the time of conversion. Plaintiff contends equally insistently for a contract measure of damages. Inasmuch as plaintiff has proved a breach of contract no convincing reason why he should be limited to damages as for a conversion is apparent. What then are the damages for breach of the contract to collect?

The carrier, by accepting the shipment under the stated conditions, agreed to deliver the goods only upon the payment of $659.00 to it as plaintiff's agent. Defendant put the goods in the possession of the buyer without performance of its promise first to collect the stated sum; in fact it collected nothing. In how much worse position does the plaintiff find himself than he would have been in had defendant performed its promise? If defendant had withheld the goods and the buyer would have paid the C.O.D. sum, plaintiff would plainly have been in a position whose advantage over that in which he now rests would be valued at $659.00. On the other hand, if defendant had withheld the goods, demanding payment of $659.00 contemporaneously with delivery, and the buyer under such circumstances would have refused to pay the C.O.D. amount, plaintiff has been damaged only to the extent of the value of the goods. Accordingly, plaintiff's damage depends upon what the buyer would have done had defendant performed its contract duty.

A court cannot determine with mathematical precision what the course of human events would have been had certain circumstances existed at a stated time. It is at this point that presumptions begin to function; they are inferences of fact drawn from admitted or proven facts and as such have a validity based upon human experience. This court must now resort to presumptions.

We find ourselves aided by pertinent analogies from that general field of the law relating to the liabilities of collecting agents. Thus, where a bank or other agency assumes the collection of checks or other commercial paper and through the default of such collection agent the paper is totally lost or otherwise the possibility of collection is wholly eliminated, a presumption of the initial collectability of the full face amount of the paper arises. In the absence of evidence rebutting this presumption, the damages to be assessed against the defaulting agent are such par value. Ft. Dearborn Nat. Bank v Security Bank, 87 Minn. 81, 91 NW 257; National Revere Bank v Nat. Bank of the Republic, 172 N. Y. 102, 64 NE 799. See **Huff v Hatch**, 2 Disney 63, **13 Oh. Dec. Reprint 39**; Hefling v Public Nat. Bank, 128 Misc. 762, 219 N. Y. Supp. 479. The Circuit Court of Appeals for the Sixth Circuit states the proposition in this manner:

"The measure of damages for negligence of a bank in failing to present a bill or note for payment, whereby a solvent indorser is released, is prima facie the face of the paper, although the defendant may show that no loss in fact resulted. This, however, is matter of defense." First Huntington Nat. Bank v Salt Lick Deposit Bank, 58 F. (2d) 553, 555.

The case of Stark v Public Nat. Bank 123 Misc. 647, 206 N. Y. Supp. 8, is of peculiar interest in the present situation because, in that case, a bank with which a check had been placed for collection, negligently lost the same (and apparently all record of it) and the owner of the check did not know the name of the drawer; it was accordingly impossible to adduce evidence either of the probability or of the improbability of the collection of the check had the bank performed its duty. In a suit by the owner of the check against the bank, the court decided that "as there was proof that the plaintiffs were damaged, and there was nothing to show their loss was less than the amount of the check, the judgment in their favor in the amount thereof was proper, and it should be affirmed, with costs." (At 206 N. Y. Supp. 12).

Perhaps even more pertinent to the issue of this case are the decisions of courts holding that where a seller draws a draft upon a buyer and forwards the draft with the attached seller's order bill of lading to a bank for collection and the bank violates its duty as an agent by giving possession of the goods to the buyer through delivery of the bill of lading, without effecting collection of the draft, the measure of damages in an action against the bank is, prima facie, the full amount of the draft. First Nat. Bank v Farmers Savings Bank, 187 NW 474; G. C. & S. F. R. Co. v No. Texas Grain Co., 32 Tex. Civ. App. 93, 74 SW 567. And where the plaintiff's theory of the case is based upon an asserted conversion of the draft itself, he "is presumed to have been damaged to the extent of its face

value" and "evidence showing the value" of the goods "to be less than the amount of the draft had no tendency to rebut the presumption that the draft was worth the sum for which it was drawn." Peninsular State Sav. Bank v Citizens Nat. Bank, 186 Iowa 418, 172 NW 293.

It is the opinion of this court that, under the circumstances of this case, there arises a presumption of the collectability of the C.O.D. sum had the possession of the goods been withheld from the buyer. A general presumption of collectability in the case of a C.O.D. shipment is as reasonable as a general presumption of non-collectability; in addition the scales are weighted in favor of collectability by reason of the pressure which the shipper is able to exert upon the consignee in such a situation. Express recognition of this presumption is found in the opinion of Cardozo, J., speaking for the court in Mogul v Lavine, 247 N. Y. 20, 159 NE 708, where it is held that the amount of the C.O.D. is prima facie evidence of the damage and that the burden shifts to the carrier to show, in reduction of damages, that collection would not have been possible had the cash been demanded.

Nor do we regard application of the presumption necessarily to be limited to a case where the C.O.D. amount is the contract price of the goods shipped. In any event there is nothing in the present case requiring such a limitation. Although the amount required to be collected here may have been in excess of the contract price for the particular shipment, still that sum represented only the balance of account between plaintiff and buyer. In addition, the shipment was undoubtedly necessary for fulfillment of the buyer's construction contract with the federal government and it is a reasonable conclusion that withholding the shipment would have induced the buyer to pay what was admittedly the balance of account as to all shipments to date. "The consignor should not be made to forfeit pressure that would have been put on the consignee to pay what was asked, that he might keep what had been tendered." Mogul v Lavine, supra. We find nothing which makes the presumption inapplicable initially.

Has the presumption of collectability been rebutted? No evidence bearing on the point has been introduced by the defendant nor is any to be found in the agreed facts. Some reference is made in the brief of defendant to the possibility of collecting on the buyer's bond to the federal government,

but no allegation of the buyer's insolvency is made and recovery on the bond would not of itself prove insolvency. In any event this court cannot enter into a consideration of the buyer's solvency as affecting the erstwhile probability of collection, because there is no evidence on that point before us.

The presumption of collectability is strengthened by the fact that plaintiff made a C.O.D. railway express shipment to the buyer subsequent to the shipment in question and before knowledge of non-payment of the $659.00 item had come to plaintiff. The C.O.D. charges on the express shipment totalling $254.62 were paid subsequent to the refusal to pay the $659.00 item.

Plaintiff made a confused attempt in his personal testimony to show an actual value of $657.00 for the shipment. Without reviewing such testimony, we may state that no finding as to the value of the goods shipped has been made, because our conviction that no such finding is necessary to the disposition of this case has been sufficiently manifested.

A final point as to mitigation of damages remains. What is sometimes erroneously referred to as a duty to mitigate damages is in reality only a necessity to keep damages down or to have plaintiff's recovery limited to such amount as would have been his loss had he acted reasonably to keep them minimized. Such a legal relation is a duty in no sense; the plaintiff has simply presented to him alternative courses of conduct under either of which his damages will be limited to the same maximum amount.

Was plaintiff under the necessity of pursuing his debtor, the buyer, and securing such compensation as was possible in order to keep down his damages, all for the benefit of the defendant herein? We think not. The defendant's default cannot cast upon plaintiff the burden of proceeding into a foreign jurisdiction where defendant's omission caused the loss initially. To require the plaintiff to do so or have his recovery reduced would be piling injury upon injury. The burden of taking the initiative in such a situation rests upon the defaulting defendant. His was the actuating cause of the loss and he cannot effectively contend that the wronged person's quiescence was the proximate cause.

Judgment must be entered for the plaintiff in the sum of $659.00 and costs.